# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 6, 2018      Decided August 10, 2018

No. 17-7075

PALETERIA LA MICHOACANA, INC., A CALIFORNIA
CORPORATION, ET AL.,
APPELLEES

v.

PRODUCTOS LACTEOS TOCUMBO S.A. DE C.V., A MEXICAN
CORPORATION,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-01623)

*Martin B. Schwimmer* argued the cause for appellant. With him on the briefs were *Lauren B. Sabol*, *Lauren B. Emerson*, *Lori L. Cooper*, and *John L. Welch*.

*Laura L. Chapman* argued the cause for appellees. With her on the brief were *Toni Qiu* and *Paul Werner*.

Before: GRIFFITH and PILLARD, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit* Judge: Paletas are frozen, fruit-based Mexican-style desserts akin to popsicles. Two vendors of paletas, one based in Mexico and one in the United States, assert conflicting trademark and false-advertising claims over words and images they use in their competing paleta sales in the United States. Productos Lacteos Tocumbo (Prolacto) is a Mexican paleta company whose owners claim their ancestor started the first paleteria in the Mexican state of Michoacán in the 1940s. Paleteria La Michoacana (PLM) is another paleta company, started by two Mexican-American brothers with pushcarts in northern California in the 1990s. Today PLM sells paletas in the United States through major retail outlets. The two companies now find themselves toe-to-toe, both selling their wares in certain U.S. markets using variants of the name "La Michoacana" (meaning "the Michoacán woman") and an image of a girl in traditional dress holding a paleta or ice cream cone (the "Indian Girl"). Broadly speaking, the parties dispute whether Prolacto or PLM, if either, owns the contested phrase and image—and, accordingly, which paleta company, if either, unfairly competed or otherwise infringed the other's trademark rights.

Prolacto and PLM disagree about the key evidence and events that determine ownership and infringement. As Prolacto sees it, PLM's adoption of the "La Michoacana" name and Indian Girl logo, the latter of which PLM registered as its own in the United States, is culturally exploitative. Prolacto insists that it has long sold paletas in Mexico under the name and image of "La Michoacana." The founders of competitor PLM first encountered the mark, says Prolacto, when they visited Mexico before opening their own paleta business in the United States. On Prolacto's account, PLM, acting in bad faith, appropriated the marks, along with the associated goodwill and reputation Prolacto had developed over decades, and passed them off here as PLM's own.

Prolacto unsuccessfully sought to register certain marks with the United States Patent and Trademark Office, but Prolacto did manage to persuade the Trademark Trial and Appeal Board to cancel the registration of one of PLM's marks, an updated version of the Indian Girl encircled by the words "La Indita Michoacana." PLM, in turn, challenged the Board's cancellation order in district court, and added fresh claims that a Prolacto version of the Indian Girl logo was invalid and infringed PLM's Indian Girl marks. Prolacto counterclaimed, charging that PLM's uses of related "La Michoacana" and Indian Girl marks amounted to unfair competition in violation of the Lanham Act.

After discovery, cross-motions for summary judgment, and a thirteen-day bench trial, the district court largely held in PLM's favor, except that it affirmed the Trademark Board's cancellation of PLM's La Indita Michoacana mark, a decision not contested here. The court held that Prolacto infringed PLM's Indian Girl marks by using similar marks in its own United States sales. As for Prolacto's counterclaims, the court held in PLM's favor. Relying on the sovereign-specific nature of trademark law, the court concluded PLM's use of "La Michoacana" and the Indian Girl in the United States did not infringe any Lanham Act rights of Prolacto, which asserted claims largely based on its prior use of the disputed words and images in Mexico. For the most part, Prolacto was not the first to use the marks in the United States. The only exception was the phrase "La Michoacana," which Prolacto had used in the Houston market before PLM adopted it. But the court found that phrase, rather than being uniquely associated with Prolacto's paletas, was a cultural commonplace in Mexican paleta sales; in Mexico, the phrase is generally associated with paletas much as, in the United States, a red, white, and blue striped pole denotes barbershop service rather than any one brand of barber. As such, Prolacto could claim no exclusive

right to the phrase. Because we find neither any error of law, nor any clear error in the district court's findings of fact, we affirm.[1]

## I. Background

## A. Factual Context

By its own account, Prolacto is the modern standard bearer of a tradition of paleta sales originating at "La Michoacana" paleteria in Tocumbo, Michoacán in the 1940s. *See Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 188 F. Supp. 3d 22, 64-65 (D.D.C. 2016).[2] But the Mexican Prolacto corporation was not founded until 1992. *Id.* at 65. It began using the "Indian Girl" design, a version of which is depicted below, "[a]t some point roughly between 1992 and 1995" in some of its paleterias in Mexico and on the packaging of its products. *Id.* at 65.



---

[1] Throughout, we refer to the disputed phrase "La Michoacana" and disputed Indian Girl logos as "marks" for ease of reference rather than to represent the legal conclusion that either is a protectable trademark.

[2] For the full findings of fact that pertain to all of the claims the parties initially levied against each other, see 188 F. Supp. 3d at 38-86. We recount only those facts pertinent to the issues appealed, and

Of the paleterias Prolacto now owns or operates in Mexico, some, but not all, use "La Michoacana" or variants involving "Michoacán" in their advertising and branding, advertise with the "Indian Girl" logo, or both. *Id.* Many other Paleterias in Mexico, unrelated to Prolacto, also sell under the Indian Girl design, the name "La Michoacana," or both. *Id.* (Prolacto contends those other vendors are in violation of its Mexican trademark rights.)

PLM, the American paleta company founded by Mexican immigrant brothers Ignacio and Ruben Gutierrez, began selling its paletas in California in 1991. *Id.* at 40-41. In preparation to open PLM, they returned to Mexico in 1990 to learn about paleta production and purchase manufacturing equipment. *Id.* at 39. The brothers saw what Ignacio described as "over a thousand" paleterias named "La Michoacana," many "distinct from each other in terms of appearance." *Id.* at 42. In hopes of evoking traditional Mexican paletas in potential customers' minds, *see id.* at 48, the brothers named their company "Paleteria La Michoacana." The district court found, based on Ignacio Gutierrez's testimony, that "[a]t the time that they adopted the marks . . . they did not believe that, in Mexico, the terms 'La Michoacana' or 'Michoacana' denoted a single source of product." *Id.* at 42. Instead, they understood the words to refer, not to any specific paleta brand, but to a genre— Michoacán paletas—much as New York cheesecake or Philly cheesesteak denote food types rather than specific makers or sources. *Id.* at 42, 48; *see also id.* at 84-85. The brothers also sold their paletas under an Indian Girl mark. The district court found that, just as they did not view the words "La Michoacana" as referencing a particular brand, the Gutierrez

---

rely on the district court's findings of fact in doing so unless otherwise noted.

brothers "did not . . . believe that, in Mexico, the [Indian Girl] mark denoted a single source of product." *Id.* at 48.

PLM's business grew quickly in the United States. PLM was, by 1999, using "La Michoacana" and its version of the Indian Girl mark in interstate commerce, *id.* at 45, and the company now sells paletas and ice cream in approximately thirty states, *id.* at 38. Ignacio bought Reuben's stake to become PLM's sole owner in 1999. *Id.* at 39, 40. PLM had by 2005 registered both its Indian Girl with paleta and Indian Girl with ice cream cone marks with the United States Patent & Trademark Office:



*Id.* at 48. At around the same time, PLM also began to advertise its products with the following statement or its equivalent: "La Michoacana is a family company founded in Tocumbo, Michoacán in the 1940's. Since then, we've continued to make premium ice cream, fruit bars and drinks that give the flavor and tradition of Mexico. Distinguish us by our logo." *Id.* at 61. The district court noted that PLM had ceased using any such "Tocumbo Statement" by the time this dispute made its way to district court. *Id.* at 71 & n.23.

Prolacto, for its part, opened its first U.S. store in 2000 through a licensee in Homestead, Florida. *Id.* at 69. Prolacto licensees then opened several additional American outposts, in Texas, Northern California, and North Carolina. *Id.* at 64.

At the time this dispute arose, Prolacto and PLM both sold paletas with the mark "La Michoacana" and an Indian Girl logo in the United States, but those sales overlapped only in two areas. The first was Northern California, where PLM's use of the disputed name and logo predated Prolacto's by at least a decade. *Id.* at 81; *id.* at 39. The parties' second overlapping market was Houston, Texas. Prolacto was the first to enter the Houston market through a licensee in 2002, and to use the disputed phrase "La Michoacana" there. *Id.* at 41-42, 48. Although PLM did not enter that market until 2005, it used both the name "La Michoacana" and the Indian Girl mark right from the start of its Houston paleta sales. *See id.* at 109. Prolacto did not begin to use the Indian Girl mark in its Houston-area paleta sales until some undetermined time after 2005, *id.* at 75-76, so PLM's use of the Indian Girl marks in Houston predated Prolacto's there.

## B. Procedural Context

Prolacto and PLM's overlapping marks became a point of legal contention in 2011, when the Trademark Trial and Appeal Board granted Prolacto's petition to cancel PLM's registration of an Indian Girl logo (closely resembling Prolacto's), encircled by the words "La Indita Michoacana." After unsuccessfully petitioning the Board to reverse its decision, PLM challenged it in federal district court under 15 U.S.C. § 1071(b). *See* 188 F. Supp. 3d at 29. This appeal arises from the protracted and acrimonious litigation that grew out of that one original claim.

PLM joined various claims in its suit challenging the Board's invalidation of its La Indita Michoacana mark, and Prolacto responded with a handful of counterclaims. The district court summarized:

PLM's Second Amended Complaint alleges four causes of action: Count I seeks reversal of the [Trademark Board's] decision to cancel the registration of PLM's LA INDITA MICHOACANA mark and [also seeks] denial of PROLACTO's cancellation petition; Count II seeks a declaration that there is no likelihood of confusion between PLM's LA INDITA MICHOACANA mark and various marks asserted by PROLACTO on the basis of their common usage of the word "MICHOACANA"; Count III alleges that PROLACTO's use of its Indian Girl mark infringes three of PLM's registered marks under 15 U.S.C. § 1114 . . .; and Count IV seeks to cancel PROLACTO's registration of certain marks containing the name LA FLOR DE MICHOACAN if a likelihood of confusion is found between those marks and PLM's marks. . . .

PROLACTO, in turn, filed seven counterclaims: Counterclaim Count I alleges that PLM infringed its registered LA FLOR DE MICHOACAN [phrase] and design mark under 15 U.S.C. § 1114(1); Counterclaim Count II alleges trademark infringement, unfair competition, passing off, false advertising, false association, and false designation in violation of 15 U.S.C. § 1125(a); Counterclaim Count III alleges trademark infringement of the District of Columbia's common law; Counterclaim Count IV alleges trademark dilution under 15 U.S.C. § 1125(c); and Counterclaim Counts V, VI, and VII seek cancellation of two of PLM's registered marks due to fraud and abandonment.

*Id.* at 29-30.

Over the course of roughly three years, the district court reviewed all eleven claims and counterclaims, ultimately holding a bench trial and issuing a comprehensive opinion based in well grounded credibility determinations and exhaustive findings of fact. It resolved Count I in Prolacto's favor, leaving the Trademark Board's cancellation of PLM's La Indita Michoacana mark in place, *id.* at 101; it resolved Counts II and III in PLM's favor, *id.* at 103, 107, and dismissed Count IV as moot, *id.* at 108. As for Prolacto's counterclaims, the court resolved all but Counterclaim II in PLM's favor at summary judgment, *id.* at 31, but ultimately entered judgment for PLM on that count, too, after trial, *id.* at 110-11, 115.

Prolacto's appeal challenges the district court's adverse resolution of only three of those claims: first, Prolacto's false association claim (Counterclaim II); second, its false advertising claim (Counterclaim II); and finally, PLM's trademark infringement claim (Count III). Those three claims arise from the Lanham Act, 15 U.S.C. § 1051 *et seq.*, a common source of federal trademark claims. *See* Barton Beebe, TRADEMARK LAW 14-15 (2017). The Lanham Act provides a right of action for unfair competition in relation to both registered and unregistered marks. Prolacto, whose marks are not registered in the United States, brought its claims against PLM under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), charging trademark infringement via PLM's false association of its products with Prolacto's, while PLM seeks to defend the validity of its registered marks under the Act's Section 32(1), 15 U.S.C. § 1114(1), against consumer confusion from Prolacto's unauthorized use.

## II. Prolacto's Lanham Act Claims Against PLM

Prolacto contends the district court erred in ruling for PLM after trial on Prolacto's false association and false advertising claims. Prolacto's marks are not registered in the United States, but because use in commerce, not mere registration, is the *sine qua non* of a trademark right under the Lanham Act, those marks could still be protected against infringement here. The conditions of that protection are laid out in Section 43(a) of the Act:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). Section 43(a) thereby provides for "two distinct bases of liability"—first, in subsection (A), false association, also known as unfair competition or trademark

infringement and, second, in subsection (B), false advertising. *See Lexmark Int'l v. Static Control*, 134 S. Ct. 1377, 1384 (2014).

Insofar as Prolacto appeals from decisions the district court made at summary judgment, our review is *de novo*. *See Estate of Coll-Monge*, 524 F.3d 1341, 1346 (D.C. Cir. 2008). We review the district court's findings of fact rendered after the bench trial with deference and disturb them only if we detect clear error. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74 (1985); *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 964-65 (D.C. Cir. 1990); Fed. R. Civ. P. 52(a). "When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson*, 470 U.S. at 575; *see ALPO Petfoods*, 913 F.2d at 965. To the extent this appeal calls for review of the district court's legal conclusions, our consideration is *de novo*. *See United States v. Cook*, 594 F.3d 883, 886 (D.C. Cir. 2010).

### A. False Association Based on PLM's Use of "La Michoacana"

Prolacto first contends that the district court erred in failing to hold PLM liable for false association based on PLM's use of the words "La Michoacana" to sell paletas primarily in the Houston, Texas-area market. To make out a false association claim, Prolacto must establish a few key elements: (1) PLM uses the mark in U.S. commerce in connection with the sale of goods or services; (2) PLM's use of its mark is likely to cause consumer confusion; and (3) PLM's use will likely damage Prolacto. *See* 15 U.S.C. § 1125(a)(1)(A); J. McCarthy,

MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 27:13 (5th ed. 2018) [hereafter McCarthy]. Prolacto can only establish the third element, damage, upon making a prerequisite showing that it has a legally cognizable commercial interest that would be harmed by infringement. *See Lexmark*, 134 S. Ct. at 1388-90; McCarthy § 32:12. A protectable interest only attaches to a term that is sufficiently distinctive to merit trademark protection, *see Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1039 (D.C. Cir. 1990) (*Blinded Veterans*), and upon a showing that the claimant is that term's first, or "prior," user, *John C. Flood of Va., Inc. v. John C. Flood, Inc.*, 642 F.3d 1105, 1109 (D.C. Cir. 2011).

The parties do not dispute that PLM has used "Michoacana" in commerce and that consumers may confuse Prolacto's and PLM's uses of the words "La Michoacana." Our review focuses, then, on whether "La Michoacana" is a sufficiently distinctive mark to merit trademark protection, and whether Prolacto established priority in use of that mark. Only upon establishing both distinctiveness and priority could Prolacto make out its false association claim. We affirm the district court's posttrial finding that Prolacto has done neither, and that its false association claim accordingly fails.

*First*, the district court committed no error in finding that Prolacto failed to establish that the "La Michoacana" mark is sufficiently distinctive. 188 F. Supp. 3d at 83-86. Prolacto primarily contends that PLM would not have adopted "La Michoacana" but for its value as a marker of Prolacto's brand. That argument, however, is belied by established law, logic, and fact.

The value of "La Michoacana" only stems from Prolacto if the mark is distinctive to Prolacto as a paleta source.

Distinctive marks are those that designate their source, *i.e.*, that signal that the goods come from "a particular trader," *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017) (quoting *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918)), and only distinctive marks garner the protection of trademark law, *see Blinded Veterans*, 872 F.2d at 1039. In other words, a source's trademark protection is only a shield against a putative infringer's use of terms or images to the extent that such use falsely suggests to buyers that they are purchasing the source's product. When a mark is not distinctive to a source, it sends no such signal.

Whether a mark is distinctive—and how distinctive it is—are questions of fact. *See* McCarthy §§ 11:3, 15:29. In measuring distinctiveness, "[c]ourts have identified four general categories: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful," that map onto a spectrum of increasing distinctiveness. *Blinded Veterans*, 872 F.2d at 1039; *see also* McCarthy §11:2.

- "Generic" marks, which describe a kind of product, have no distinctiveness at all, and therefore merit no trademark protection. *See Blinded Veterans*, 872 F.2d at 1039; *see also* McCarthy § 11:1. For example, "Frozen Dessert" as a brand name for ice cream or "Aspirin" for pain medication would be generic marks, as they simply name the genre of their products. *See Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983).

- "Descriptive" marks are more specific, but not inherently so. They are distinctive—and thus protected—"only upon proof of secondary meaning—*i.e.*, upon proof that the public recognizes only one source of the product or service." *Blinded Veterans*, 872 F.2d at 1039-40; *see Two Pesos, Inc. v. Taco*

*Cabana, Inc.*, 505 U.S. 763, 768-70 (1992); McCarthy § 11:16. A descriptive mark—like "Investacorp" to name a business that provides advice on corporate investment opportunities, *see Investacorp, Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1523-24 (11th Cir. 1991)—would acquire secondary meaning only if consumers observing that mark identified it with a specific seller. Determining whether a descriptive mark has secondary meaning, and is thus protected, depends on a factual inquiry whether consumers in the relevant purchasing public associate the mark with a specific producer. Such association presumably could be shown, for example, in the case of American Airlines.

The remaining two categories of marks are inherently distinctive such that they do not require proof of acquired distinctiveness to garner trademark protection. Whether a mark is inherently distinctive depends on the relationship between that mark and the product it is used to sell:

- "Suggestive" marks "suggest[], rather than describe[], some particular characteristic of the goods or service to which [they] appl[y] and require[] the consumer to exercise the imagination to draw a conclusion as to the nature of the goods and services." *Zatarains*, 698 F.2d at 791. Suggestive marks, in other words, "indirectly convey an impression of the products or services," so are on their own distinctive enough in how they relate to the source to obviate the need for the party claiming the mark to make a showing of secondary meaning. *Blinded Veterans*, 872 F.2d at 1040; *see* McCarthy § 11:62. Examples of marks held to be suggestive include "Chicken of the Sea" canned tuna, *see Gen. Shoe Corp. v. Rosen*, 111 F.2d 95, 98 (4th Cir. 1940),

and "Penguin" refrigerators, *see Union Nat. Bank of Texas, Laredo, Tex. v. Union Nat. Bank of Texas, Austin, Tex.*, 909 F.2d 839, 845 (5th Cir. 1990).

- Similarly, "arbitrary" marks—which have "no intrinsic connection" to the product they describe, like Apple computers—and "fanciful" marks—neologisms like Kodak coined to name a specific product, *see Zatarains*, 698 F.2d at 791—are the most distinctive, and require no proof of secondary meaning. *Blinded Veterans*, 872 F.2d at 1040.

The distinctiveness of a mark is typically determined only in relation to a given product, with the mark's categorization dependent on the nature of that relationship. "For example, the mark BRILLIANT may be 'descriptive' on diamonds, 'suggestive' on furniture polish, and 'arbitrary' on canned applesauce." McCarthy § 11:64.

The district court ultimately found that "La Michoacana" was not a sufficiently distinctive mark to merit trademark protection. At summary judgment, the court explained it was "somewhat unclear what category the parties believe the marks fall into but, given their focus on the secondary meaning inquiry, it appears that they both agree that the marks are not inherently distinctive and instead are better defined as geographically descriptive." 69 F. Supp. 3d at 210. But the court declined to grant either party summary judgment on the issue of secondary meaning, finding that substantial questions of material fact remained. *Id.* at 211-12.

Prolacto objected that the court had misconstrued its argument: It insisted that "La Michoacana" was an arbitrary rather than a descriptive mark. 188 F. Supp. 3d at 84. Following trial, the district court addressed the question whether "La Michoacana" was an inherently distinctive mark,

and found Prolacto's position factually untenable. An arbitrary mark is one that does not describe the product it sells at all, *see* McCarthy § 11:11, but "La Michocana," used as a name for a paleta company, captured the association of paletas with the state of Michaocán. 188 F. Supp. 3d at 83-86, 111. Based on ample trial evidence, including testimony about the ubiquity of paleta shops in Mexico referring to their wares with the term "Michoacana," the court found that the term evoked a type of product generally linked to the named locale, much like the names Philly cheese steak or Chicago-style pizza, so did not have an arbitrary relationship to paletas. *Id.* at 42, 85-86.

The district court further held that Prolacto had not offered proof that "La Michoacana" had acquired secondary meaning, *i.e.* that consumers identified "La Michoacana" with Prolacto itself; consequently, "La Michoacana" could not qualify for trademark protection as a descriptive mark. The court explained that, in making its case, Prolacto barely offered any of the "commonly considered" evidence for secondary meaning, such as "survey evidence, the length and manner of use of the name, the nature and extent of advertising and promotion of the name, the volume of sales, the instances of actual confusion." *Id.* at 85. While Prolacto identified a few instances of confusion between Prolacto and PLM's products in their overlapping markets, Prolacto did not offer any testimony or other support for the proposition that it was the words "La Michoacana," as opposed to imaging on the packages, for example, that caused the confusion. *Id.* at 86. Further, the court found, much of the testimony offered to show consumer confusion came from "witnesses [who] lacked credibility due to their close family relationship with PROLACTO's lead counsel," and even those witnesses' testimony suggested they viewed the name "La Michoacana" as a referring to a type of product rather than a single brand. *Id.* at 86 & n.46. Prolacto thus failed to establish that

consumers identified the mark "La Michoacana" as distinctive to Prolacto. *Id.* at 86.

Prolacto's first contention on appeal—that "the error here is that the term ['La Michoacana'] was never shown to be [merely] descriptive," *see* Appellant's Br. at 35 n.16; *see also id.* at 34-35, 37—places the burden of proof on the wrong party. Distinctiveness is an element of Prolacto's false association claim. Establishing that its mark is inherently distinctive, not just descriptive, was therefore Prolacto's burden to bear. The district court did not err in requiring Prolacto to make out that essential element of its own false association claim.

In holding that "La Michoacana" was not a distinctive mark, the district court noted that "[h]ere, the same evidence that would be required to establish secondary meaning would also resolve whether 'Michoacana' is arbitrary or descriptive." *Id.* at 95. To the extent that the district court intended thereby to state a general rule of law, it was incorrect. A mark may well be inherently distinctive even if it lacks secondary meaning. A factual record, typically including surveys or other empirical evidence, is necessary to show secondary meaning (*i.e.*, that consumers identify a mark with a specific producer). Inherent distinctiveness, however, focuses on the mark's link to the product rather than its producer, and may be evident on consideration of the mark and the product themselves. We need not inquire whether the district court's error in eliding the distinct analytic categories affected the judgment, however, because any challenge on that ground was forfeited by Prolacto's failure to plainly raise the point on appeal. *See Hall v. District of Columbia*, 867 F.3d 138, 152 n.1 (D.C. Cir. 2017).

Finally, Prolacto also asserts that PLM's appropriation of the words "La Michoacana" is itself evidence that the mark is distinctive. That argument is logically flawed. It does not

follow that mere appropriation of a phrase would itself be evidence of that phrase's distinctiveness. A term may usefully signify a genre without signifying a brand—as in the cases of New York-style cheesecake or Tex-Mex cuisine. Further, Prolacto points to no specific evidence of distinctiveness that the district court overlooked. The evidence the court did consider amply supported its factual determinations that the phrase "La Michoacana" was neither inherently distinctive nor had acquired distinctiveness. *See* 188 F. Sup. 3d at 85-86. To the extent that those findings turn at least in part on the district judge's credibility determinations, we are especially loath to invalidate them. *See ALPO Petfoods*, 913 F.2d at 965.

The district court's findings that "La Michoacana" lacks distinctiveness—whether inherent or acquired—are not erroneous, let alone clearly so. Prolacto accordingly cannot establish false association with respect to the "La Michoacana" marks under Section 43(a) of the Lanham Act, and we affirm the district court's dismissal of that claim.

*Second*, even if "La Michoacana" were distinctive and thus potentially subject to trademark, Prolacto's challenge would largely fail because, as the district court found, Prolacto did not establish its "priority of use" for the "La Michoacana" mark in most U.S. markets. In the United States, a party acquires trademark rights by being the first to use the mark in U.S. commerce. *See* McCarthy § 16:1; *see also Estate of Coll-Monge*, 524 F.3d at 1346-47. The United States subscribes to the "territoriality doctrine," under which "a trademark is recognized as having a separate existence in each sovereign territory in which it is registered or legally recognized as a mark." McCarthy § 29:1; *accord ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 155 (2d Cir. 2007). Priority of use in the United States is what triggers protection under U.S. law, and prior use

of a mark outside the United States ordinarily does not create a trademark right here.

Prolacto initially claimed that PLM violated the Lanham Act's prohibition on false association by using both the "La Michoacana" and Indian Girl marks in Houston, Texas, Florida, and Northern California. At summary judgment, however, the district court held that the undisputed evidence showed PLM did not do business in Florida, eliminating the possibility that Prolacto suffered infringement in that market, *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 69 F. Supp. 3d 175, 207 (D.D.C. 2014); it further held that PLM's use of the marks in the Northern California market—and even its registration of those marks— undisputedly predated Prolacto's entry into that market by several years, defeating Prolacto's infringement claim in Northern California, *id.* at 207-08. Prolacto's false association claim was thereby limited to the Houston market. *Id.* After trial, the court found that Prolacto could not establish its priority, even within the Houston market, with respect to the Indian Girl logo; Prolacto did not use that mark in Houston until after PLM started doing so in 2005. 188 F. Supp. 3d at 76-77, 109. (As discussed above, Prolacto did establish prior use of "La Michoacana" in the Houston market, but its priority gained it no protection because Prolacto failed to show "La Michoacana" was distinctive, *see supra* pp. 12-18).

Prolacto concedes that PLM is the prior user of all of the contested marks in the relevant United States markets, save "La Michoacana" in the Houston area. Prolacto does not challenge the district court's factual determinations regarding PLM's priority in the other U.S. markets, whether those determinations result from the court's legal holdings as to the undisputed facts at summary judgment, or from its factual findings on the full trial record. Instead, Prolacto contends only

that it has trademark rights in the United States based on its own undisputed prior use in Mexico.

Prolacto makes two alternative arguments, each of which would require us to decide a matter of first impression. Principally, Prolacto urges us to read Section 43(a)(1)(A)'s protection against false association not to depend on any proof of Prolacto's prior use in the United States, as the Fourth Circuit recently did in *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 705-08 (4th Cir. 2016). The *Belmora* court reasoned that "the plain language of § 43(a) does not require that a plaintiff possess or have a trademark in U.S. commerce as an element of the cause of action," *id.* at 706; instead, a plaintiff that held the same mark in Mexico could simply show that defendant's deceptive use of the mark in U.S. commerce was likely to injure it, at least where the Mexican mark had given rise to a reputation in the United States. *Id.* at 706, 708-09. Prolacto argues, along those lines, that PLM's use of the "La Michoacana" mark in U.S. commerce injured Prolacto by trading on its goodwill, which Prolacto accrued in Mexico before entering the U.S. market. Prolacto charges that, in doing so, PLM usurped some of Prolacto's business by passing off its wares in the United States as Prolacto's. *See* Appellant's Br. at 27-28 & n.13.

We need not pass on *Belmora*'s reading of Section 43(a)(1)(A), however, because Prolacto has not established an injury to its commercial sales or prospects—a fact Prolacto acknowledges. *See* Oral Arg. Tr. 7:10-8:2. The district court noted that "PROLACTO offered no evidence, for example, concerning any loss of sales from customers who bought PLM's products in the United States in lieu of PROLACTO's products in Mexico. Nor did it offer any evidence of consumer confusion in Mexico concerning its products, any credible evidence showing a crossover of the parties' customers

between the United States and Mexico, or any other evidence suggesting that PROLACTO suffered any injury in the Mexican market." 188 F. Supp. 3d at 111 n.66. Because Prolacto had a full opportunity to develop the factual record, we decline its request that we either presume the relevant injury or remand for further factual development in the district court.

As for Prolacto's second alternative theory of unfair competition loosely based on the *Tea Rose-Rectanus* exception to the prior-use principle, we reject Prolacto's contention that the exception is "[c]onceptually similar" to its claim. *See* Appellant's Br. 50. That exception stems from *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403 (1916) (*Tea Rose*), and *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90 (1918) (*Rectanus*). The Supreme Court in the *Tea Rose* and *Rectanus* cases recognized a regional exception to domestic trademark rights' national scope: A junior user could have regional rights over a senior user in the United States where the junior's use occurred in areas remote from the senior's use. Following the parties' lead, we assume, without deciding, that despite the intervening changes in interstate commerce, transportation, and internet sales, this early twentieth-century exception has traction in the twenty-first century marketplace. We can so assume because, by its own terms, the *Tea Rose-Rectanus* exception is inapplicable to this case. Prolacto is not the senior user within the United States. *See* 188 F. Supp. 3d at 88.

Despite this clear difference, Prolacto views *Tea Rose-Rectanus* as helpful because the rights recognized under the exception implicitly depend on the good faith of the junior's use and, Prolacto insists, PLM appropriated the marks in bad faith. Prolacto thus deploys *Tea Rose-Rectanus*'s general concept to cast itself as an internationally senior user and then to suggest that, under *Tea Rose-Rectanus*, we should hold any

regional right PLM might have to be defeated as derived from bad faith appropriation. *See* Appellant's Br. at 25, 50.

Prolacto's theory is in tension with the territorial foundations of trademark law, under which its prior use in Mexico does not establish priority in United States markets. Even on its own terms, the theory fails in light of the district court's finding that PLM's adoption of the mark was not in bad faith. *See* 188 F. Supp. 3d at 42, 86-92. Rather, the district court found that when PLM adopted its marks it was unaware of Prolacto and "did not believe that the term denoted a single source of product in Mexico." *Id.* at 91.[3]

In sum, Prolacto's false-association claim fails because Prolacto has not established a right to the "La Michoacana" mark or injury from PLM's use sufficient to establish false association in violation of Section 43(a) of the Lanham Act. We thus affirm the district court's entry of judgment for PLM on that claim.

### B. Prolacto's Claim that PLM Engaged in False Advertising

Prolacto next claims that PLM's advertisements, particularly its use of the Tocumbo Statement, violate the false advertising prohibition of Section 43(a)(1)(B) of the Lanham Act. To prevail in a false advertising suit under Section 43(a), "a plaintiff must prove that the defendant's ads were false or misleading, actually or likely deceptive, material in their effects on buying decisions, connected with interstate

---

[3] Prolacto does not on appeal invoke the "well-known marks" exception to territorial prior use principles. *See* Appellants' Br. at 24. *Compare Grupo Gigante SA DE CV v. Dallo & Co.*, 391 F.3d 1088 (9th Cir. 2004), *with ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135 (2d Cir. 2007).

commerce, and actually or likely injurious to the plaintiff." *ALPO Petfoods*, 913 F.2d at 964. The parties do not dispute that the Tocumbo Statement was, in fact, false or misleading, actually or likely deceptive, and connected with interstate commerce. *See* 69 F. Supp. 3d at 216. Our review is therefore confined to the elements of materiality and injury. As elements of its false advertisement claim, injury and materiality are Prolacto's to prove. Prolacto has not carried that burden.

The district court did not err in concluding Prolacto failed to prove a relevant injury. Reviewing all the facts before it, the district court concluded that "PROLACTO offered little, if any, evidence that any consumers even saw one of the [allegedly false advertising] statements, let alone that any consumers factored the statement into their decision whether to purchase or not purchase PLM's products." 188 F. Supp. 3d at 62-63. The court methodically surveyed all of the evidence Prolacto offered to establish injury, starting with the Tocumbo Statement.

First, in its effort to show that consumers were swayed by the Tocumbo Statement, Prolacto offered testimony of a paletas expert, Sam Quinones, who had taken several trips to Mexican paleterias and written articles on the subject. *Id.* at 62. While Quinones testified that he had read the "small print" on PLM's paleta wrappers (which at certain times included the Tocumbo Statement), he could not recall what it said; "[t]hus," the court concluded, "it is not even clear whether [he] read the Tocumbo Statement, in any of its variations." *Id.* The court further noted that Quinones, who testified to spending fifteen minutes reading the packaging of paletas, was far more attentive than the average consumer—a fact that reinforced the court's conclusion that the average consumer was unlikely to have been affected by the Statement. *Id.*

Second, Prolacto introduced testimony of the company's counsel's own family members in an effort to show the Tocumbo Statement's effect. *Id.* We defer to the court's credibility determination that their testimony was not reliable.

Third, Prolacto offered a "consumer survey," the results of which have little bearing on injury. *Id.* at 62-63. In that survey, Prolacto's expert asked consumers to read and interpret the Tocumbo Statement. *Id.* The expert did not, however, "test the materiality of the statement on consumers' decision-making processes" or attempt to replicate the environment of a marketplace to "determine whether, for example, any consumers would actually take the time to study PLM's product packaging and read about its purported history before deciding whether to make a purchase." *Id.* at 63. The court reasonably concluded: "Simply put, there was no credible evidence that the Tocumbo Statement has had, or would have, any real impact on PROLACTO in any way." *Id*.

Beyond the deficient evidence of injury stemming from the Tocumbo Statement, the court found that PLM's use of other images and phrases in its advertising similarly had no unlawfully injurious effect on Prolacto. *Id.* at 63-64, 112-15. The name "La Michoacana," for example, lacks distinctiveness, and images of sand beaches are a common advertising trope. Prolacto points to nothing in the record that contradicts or even weakens the court's findings and conclusions, and we see no source of clear error.

Because the district court did not clearly err in finding a lack of credible evidence of any injury, and Prolacto's failure to establish injury is fatal to its claim, we need not consider additional arguments regarding materiality. *See ALPO Petfoods*, 913 F.2d at 964. On this ground, we affirm the district court's conclusion that Prolacto has not established

PLM's use of the Tocumbo Statements and other advertising materials constituted false advertising in violation of Prolacto's rights under Section 43(a)(1)(B) of the Lanham Act.

### III. PLM's Lanham Act Claim Against Prolacto's Use of Indian Girl Logos

Finally, Prolacto appeals the district court's holding that it infringed PLM's trademark rights in the Indian Girl marks, in violation of Section 32 of the Lanham Act. Section 32 protects registered trademarks from infringing use. It provides:

> Any person who shall, without the consent of the registrant—
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake
>
> shall be liable in a civil action by the registration for the remedies hereinafter provided.

15 U.S.C. § 1114(1). To establish a violation of Section 32, the claimant must show (1) that it owned a registered mark (2) which another person used in commerce, and that (3) such use likely caused consumer confusion. *See id.*; *see also* McCarthy § 23:76. The parties do not dispute that PLM has used its marks in commerce or that PLM's and Prolacto's Indian Girl marks might be confused. *See* 188 F. Supp. 3d at 107. The issue here is whether PLM owns the Indian Girl marks that Prolacto used.

PLM's two Indian Girl marks are registered with the U.S. Patent & Trademark Office, and have been since 2005. *See id.* at 48. The fact of registration, under the Lanham Act, is itself

"prima facie evidence of the validity of the registered mark and . . . of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein." 15 U.S.C. § 1115(a). PLM sufficiently established its ownership by offering evidence of the marks' registration. And because proof of registration is *prima facie* evidence of ownership, we need not consider the merits of Prolacto's challenge to the marks' "incontestability" under 15 U.S.C. § 1065. Regardless of whether that ownership is incontestable, the evidence does not rebut the presumption of PLM's ownership. Accordingly, we affirm the district court's conclusion that Prolacto infringed PLM's use of its registered marks.

**\* \* \***

We find no merit in Prolacto's remaining arguments, including its objections to the district court's denial of a right to a jury trial on its equitable claim to an accounting of profits, and to several evidentiary determinations and other orders identified in the notice of appeal but not discussed in the briefing. Accordingly, we affirm the district court's entry of judgment for PLM on Prolacto's false association and false advertising claims under Section 43(a) and PLM's infringement claim under Section 32(1).

*So ordered.*