# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 8, 2011          Decided June 17, 2011

No. 10-7098

JOHN C. FLOOD OF VIRGINIA, INC., ET AL.,
APPELLANTS

v.

JOHN C. FLOOD, INC., ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:06-cv-01311)

*Stephen J. Zralek* argued the cause for appellants. With him on the briefs was *Paul W. Kruse*.

*Robert A.W. Boraks* argued the cause for appellees. With him on the brief was *Benjamin J. Lambiotte*.

Before: SENTELLE, *Chief Judge*, TATEL, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*: Two businesses with nearly identical names—John C. Flood, Inc. ("1996 Flood") and

John C. Flood of Virginia, Inc. ("Virginia Flood")—brought suit against each other over which company had the right to use two trademarks: JOHN C. FLOOD and its abridged form FLOOD. The district court concluded that 1996 Flood was the proper owner of the two trademarks and that Virginia Flood, as the licensee of the marks, was estopped from challenging 1996 Flood's ownership. *John C. Flood of Virginia, Inc. v. John C. Flood, Inc.*, 700 F. Supp. 2d. 90, 98-99 (D.D.C. 2010). Because we agree with the district court on these points, we affirm the decision below, but remand the case back to the district court for clarification regarding whether Virginia Flood's use of the mark JOHN C. FLOOD OF VIRGINIA was prohibited by its decision.

## I.

The parties in this case are two plumbing, heating and air conditioning businesses and the principals of those businesses whose histories are intertwined. The story begins in 1984 when Mark Crooks and Mel Davis—defendants below and two of the appellees in this case—incorporated John C. Flood, Inc., a Maryland business that served the Washington D.C. metropolitan area ("1984 Flood"). 1984 Flood traded under the service mark JOHN C. FLOOD, its abbreviated form FLOOD, and variations thereof. In 1988, looking to expand into the Virginia market, Crooks, Davis and two of their 1984 Flood employees, Clinton Haislip and James Seltzer—plaintiffs below and two of the appellants in this case—incorporated a separate Virginia business, John C. Flood of Virginia, Inc. Haislip and Seltzer originally owned only 49% of Virginia Flood, but soon came to own 50% of the business to become equal owners with Crooks and Davis. Although Virginia Flood had a verbal license to use the marks JOHN C. FLOOD and FLOOD with or without the modifier "of Virginia," the parties disagree over the nature and scope

of that license. Regardless of what limitations were or were not part of the original oral agreement, neither party disputes that Virginia Flood has used the two disputed marks continuously since 1989.

In June 1991, 1984 Flood filed for Chapter 11 bankruptcy reorganization. One month later, Crooks and Davis resigned as officers of Virginia Flood, but continued to operate 1984 Flood in bankruptcy until March 1993, when the bankruptcy court appointed a trustee and converted the case to a Chapter 7 bankruptcy. At that time, Crooks and Davis shut down 1984 Flood's operations and ceased monitoring the operation of Virginia Flood and its use of the disputed marks. In 1995, Haislip and Seltzer purchased Crooks and Davis's 50% share of Virginia Flood from the trustee, becoming the sole owners of the business.

After leaving 1984 Flood, Crooks and Davis joined with Robert and Joanne Smiley—the remaining defendant/appellees—and continued to trade in the plumbing, heating and air conditioning business through various corporations known as J.C.F, Inc., J.C. Flood, Inc., John C. Flood of DC, Inc. and John C. Flood of MD, Inc. (collectively the "New Flood entities"). While operating the New Flood entities, Crooks, Davis, and the Smileys misappropriated the assets, including the disputed marks, of 1984 Flood. In an effort to preserve 1984 Flood's assets, in May 1995 the bankruptcy trustee filed an adversary proceeding, which resulted in the bankruptcy court issuing a consent order for a preliminary injunction against the New Flood entities and for the appointment of a receiver with the authority to take charge of the New Flood entities and their assets. By August 1995, the bankruptcy court made the injunction and the receivership permanent.

In October 1995, the bankruptcy trustee proposed that the disputed marks, as well as the seized assets and stock of the New Flood entities, be sold to Crooks, Davis, and the Smileys. As creditors of the 1984 Flood bankruptcy estate, Haislip and Seltzer objected to the sale on the grounds that Crooks, Davis, and the Smileys had unlawfully diverted and concealed estate assets. In response, Crooks and Davis withdrew and the Smileys increased the amount of their bid. Haislip and Seltzer made a competing bid to purchase only the disputed marks and the 1984 Flood phone numbers. In February 1996, over Haislip and Seltzer's objections, the trustee executed a bill of sale conveying the disputed marks and the stock of the New Flood entities to the Smileys, who then incorporated a new Maryland business under the name John C. Flood, Inc. ("1996 Flood").

Since 1996, both 1996 Flood and Virginia Flood have traded in the plumbing, heating, and air conditioning business in the Washington D.C. metropolitan area with both companies using the marks JOHN C. FLOOD and FLOOD. In 2000, Virginia Flood sought and obtained two trademark registrations from the United States Patent and Trademark Office, one for the phrase "JOHN C. FLOOD" and one for a logo incorporating that phrase. According to 1996 Flood, when it learned that Virginia Flood had registered the disputed marks, it brought an action before the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office to cancel the registrations. That action was suspended pending disposition of a civil action in July 2006 after Virginia Flood brought a trademark infringement suit against 1996 Flood. In response, 1996 Flood filed a counterclaim claiming, *inter alia*, that 1996 Flood had priority over Virginia Flood to the disputed marks.

Throughout the subsequent litigation, Virginia Flood argued that 1984 Flood abandoned all rights to the disputed marks when it created a "naked license" during its Chapter 7 bankruptcy. Virginia Flood also argued that it suffered a decline in its quality of service, due to no fault of its own, immediately following the appointment of a trustee and 1984 Flood's cessation of oversight and involvement. As we noted above, during that time 1984 Flood did not operate and no one from 1984 Flood other than the bankruptcy trustee was available to monitor Virginia Flood's use of the licensed trademarks. As the Ninth Circuit has noted, this lack of supervision is important because "'uncontrolled or 'naked' licensing may result in the trademark ceasing to function as a symbol of quality and controlled source.'" *Barcamerica Int'l. USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 596 (9th Cir. 2002) (quoting MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:48 at 18-79 (4th ed. 2001)). "Consequently, where the licensor fails to exercise adequate quality control over the licensee, 'a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark.'" *Id*. (quoting *Moore Business Forms, Inc. v. Ryu*, 960 F.2d 486, 489 (5th Cir. 1992)). Although naked licensing was a central element of Virginia Flood's claim, the district court never had an opportunity to rule on the merits of the naked licensing argument.

Instead, ruling on the parties' cross-motions for summary judgment, the district court concluded that "[b]ecause 1996 Flood is the successor-in-interest of 1984 Flood, the original owner of the FLOOD marks, and because Virginia Flood is barred by the doctrine of licensee estoppel from asserting its naked licensing claim to obtain priority over the marks, 1996 Flood is entitled to summary judgment on all of Virginia Flood's claims" and to "a declaration of its

priority over Virginia Flood and of its exclusive right to use and register the marks JOHN C. FLOOD and FLOOD." *John C. Flood of Virginia*, 700 F. Supp. 2d. at 98-99. For the reasons set forth below, we agree.

## II.

Virginia Flood argues that the district court made two errors: first, holding that 1996 Flood had priority over the disputed marks, and second, holding that Virginia Flood was legally barred under the theory of licensee estoppel from challenging 1996 Flood's ownership. Virginia Flood claims that the district court improperly discounted the New Flood entities' unlawful use of the disputed marks when it determined that 1996 Flood had priority to the marks over Virginia Flood. Virginia Flood argues that the New Flood entities' unlawful use broke the chain of priority upon which the district court relied to determine that 1996 Flood was the proper successor-in-interest of 1984 Flood, the creator and original owner of the marks. Once that chain of priority was broken, Virginia Flood argues that its continued use of the marks from 1989 to the present—compared to 1996 Flood's use of the marks from 1996 to the present—established its ownership of the mark by demonstrating that it was the first to use the mark in commerce.

Virginia Flood also asserts that the equitable doctrine of licensee estoppel should not apply in this case. Virginia Flood argues that it should not be estopped from challenging 1996 Flood's ownership of the disputed marks because the verbal license between the parties did not include an explicit no-challenge provision; because Virginia Flood attempted to maintain the quality of the marks, but failed to do so only because of lack of supervision by the licensor; and because in this case, the trademark principles that discourage naked

licensing should outweigh the contract principles that are enforced by licensee estoppel.  Virginia Flood also rejects the distinction drawn by the district court between offensive and defensive use of naked licensing by the licensee.  Virginia Flood asserts that there is no legal authority to support the district court's conclusion that Virginia Flood could argue naked licensing as an affirmative defense in an infringement case, but could not assert naked licensing offensively to challenge the priority of the licensor.  Finally, Virginia Flood argues that the equities in this case strongly support Virginia Flood's claim to priority over the marks because granting Virginia Flood priority would be the most just outcome for the parties.

We review the district court's summary judgment determination *de novo*, drawing all reasonable inferences from the evidence in Virginia Flood's favor.  *Adams v. Rice*, 531 F.3d 936, 942 (D.C. Cir. 2008).  Summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In this case, we agree with the parties who both assert that there is no dispute of material fact and that judgment as a matter of law is appropriate.

## A.

"Undoubtedly, the general rule is that, as between conflicting claimants to the right to use the same mark, priority of appropriation determines the question."  *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 100 (1918).  "Ordinarily, a party establishes ownership of a mark by being the first to use the mark in commerce," *Estate of Coll-Monge v. Inner Peace Movement*, 524 F.3d 1341, 1347 (D.C. Cir.

2008), and in this case, there is no dispute that 1984 Flood was the first entity to acquire priority in the disputed marks via such use. The district court traced an unbroken chain of priority from 1984 Flood, to the 1984 Flood bankruptcy estate, to 1996 Flood. Although this chain does not include the New Flood entities, Virginia Flood argues that the unlawful use of the disputed marks by the New Flood entities breaks the chain of priority established by the district court.

Virginia Flood's argument is fundamentally flawed. The unlawful use of the marks by the New Flood entities was unlawful precisely because they did not have legal title to the marks when they used them. When the New Flood entities were misappropriating the disputed marks, the marks were among the assets owned by the 1984 Flood bankruptcy estate. There is no evidence or even a suggestion that the New Flood entities owned the marks or that the bankruptcy trustee licensed the marks to the New Flood entities. As the district court properly noted, the chain of priority in no way includes the New Flood entities and therefore the unlawful use of the marks by the New Flood entities—companies expressly excluded from the chain of priority—cannot break that chain. 1996 Flood, a company with no legal relationship to the New Flood entities, did not obtain the marks from the New Flood entities or derive any priority from the New Flood entities' unlawful use. To the contrary, 1996 Flood legally purchased the marks directly from the bankruptcy estate after offering a superior bid to the one Virginia Flood offered.

Presumably, Virginia Flood's unlawful use argument stems from frustration over the fact that 1996 Flood—a business associated with the same people who operated the New Flood entities—now has priority to the disputed marks. *See* Brief of Appellants at 24 ("Despite the fact that the [New Flood entities'] use was in violation of the law and a specific

court order, the lower court considered such action to warrant no negative consequences."). 1996 Flood's priority is derived, however, not from the New Flood entities, but instead from the bankruptcy trustee's sale of the marks to 1996 Flood. The New Flood entities' unlawful use of the disputed marks is irrelevant to 1996 Flood's claim to priority. Priority over the disputed marks originated with 1984 Flood, transferred to the 1984 bankruptcy estate, and was then conveyed to 1996 Flood via a bill of sale with the approval of the bankruptcy court. The district court did not err when it held that 1996 Flood was the successor-in-interest of 1984 Flood and the legal owner of the marks.

**B.**

Once the district court concluded that 1996 Flood was the rightful owner of the disputed marks, it rejected Virginia Flood's arguments attacking 1996 Flood's ownership under the theory that, as a licensee, Virginia Flood was barred from making such an attack by the doctrine of licensee estoppel. *John C. Flood of Virginia*, 700 F. Supp. 2d at 97 ("Virginia Flood's status as the licensee bars it from using the naked licensing doctrine as a weapon to pry ownership of the FLOOD marks from 1996 Flood."). Although this circuit has never explicitly recognized the equitable doctrine of licensee estoppel, some other circuit courts have held that, in general, trademark licensees are estopped from challenging the validity of the licensor's title because by agreeing to the license, the licensee has recognized the validity of the licensor's ownership. *See Seven-Up Bottling Co. v. Seven-Up Co.*, 561 F.2d 1275, 1279-80 (8th Cir. 1977) (restating the "'long settled principle of law that a licensee of a trademark or tradename may not set up any adverse claim in it as against its licensor'") (quoting *Pac. Supply Coop. v. Farmers Union Cen. Exch.*, 318 F.2d 894, 908-09 (9th Cir. 1963)). More

recently, other circuits have permitted licensees to make such challenges, but only based upon facts that arose after the license expired. *See, e.g.*, *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 548 (10th Cir. 2000) (suggesting that a licensee may challenge the licensor's title to a trademark based on events that occurred after the license expired); *WCVB-TV v. Boston Athletic Ass'n*, 926 F.2d 42, 47 (1st Cir. 1991) (same); *Prof'l Golfers Ass'n of Am. v. Bankers Life & Casualty Co.*, 514 F.2d 665, 671 (5th Cir. 1975) (same). The Second Circuit has taken an even less restrictive view, holding that every claim of licensee estoppel should be evaluated by balancing the public interest in favor of challenging invalid trademarks against the private interest in the enforcement of contracts. *See Idaho Potato Comm'n v. M & M Produce Farm & Sales*, 335 F.3d 130, 137 (2d Cir. 2003) (adapting the patent licensee estoppel test articulated in *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969), for use in the trademark context).

Virginia Flood, relying on two unpublished district court opinions both from districts in the Sixth Circuit, argues that modern courts "apply licensee 'estoppel as a non-rigid equitable doctrine that is only employed based on a full consideration of the totality of the circumstances.'" Brief of Appellants at 31 (quoting *Kebab Gyros, Inc. v. Riyad*, No. 3:09-0061, slip op. at 6 n.7 (M.D. Tenn. Dec. 17, 2009) (unpublished)). The district court opinions cited by Virginia Flood derive this interpretation of licensee estoppel from the Restatement of Unfair Competition, which states: "licensee estoppel is an equitable doctrine, and a court remains free to consider the particular circumstances of the case, including the nature of the licensee's claim and the terms of the license." *See, e.g.*, *Pride Publ'g Group v. Edwards*, No. 1:08-cv-94, slip op. at 4 (E.D. Tenn. May 23, 2008) (unpublished) (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 33 (1995)). Virginia Flood argues that based on a totality-

of-the-circumstances analysis, licensee estoppel would not apply in this case.

We disagree. As we noted above, we have not previously had the opportunity to define the contours of the licensee estoppel doctrine in this circuit and there is no need to do so now. We need not determine whether licensee estoppel should be an automatic bar to all trademark licensee challenges of its licensor's ownership, or whether the court should engage in a totality-of-the-circumstances analysis, or whether some intermediate standard should apply, because in this case the result is the same. The theory underlying the licensee estoppel doctrine is that a licensee should not be permitted to enjoy the benefits afforded by the license agreement while simultaneously urging that the trademark which forms the basis of the agreement is void. *Lear*, 395 U.S. at 656. Virginia Flood, which has benefitted from its license of the disputed marks for over two decades, now asks us to declare that the licensed trademarks have been void since 1993. The facts in this case convince us that the equities, no matter how balanced, weigh in favor of applying licensee estoppel here.

First and foremost, Virginia Flood's case is irreparably harmed by Virginia Flood's failure to raise an appropriate objection to the sale of the disputed marks by the 1984 Flood bankruptcy trustee in 1995. Virginia Flood concedes that, at that time, it was licensing the disputed marks from the 1984 Flood bankruptcy estate and had been doing so continuously either from 1984 Flood or from the estate since 1989. If, in 1995, Virginia Flood believed that 1984 Flood's trademark had lapsed, due to naked licensing or for any other reason, Virginia Flood should have made that objection to the sale of the trademark by the bankruptcy trustee. Although Virginia Flood did object to the consideration of 1996 Flood's

bid—due to the prior misappropriation of the trademarks by the New Flood entities—Virginia Flood never suggested that it took issue with the validity of the disputed trademarks. To the contrary, Virginia Flood offered to buy the marks, and only failed to do so because it was outbid by 1996 Flood.

Virginia Flood not only failed to raise its objection at the time of the sale, but it also failed to raise it in June 1996 when 1996 Flood informed Virginia Flood that it was infringing its trademarks and demanded that Virginia Flood stop using the marks without the distinguishing designator "of Virginia." Virginia Flood concedes that in response to 1996 Flood's demands, Virginia Flood's counsel informed 1996 Flood that its telephone ads and signage would include the words "of Virginia." Virginia Flood also concedes that it did not contest 1996 Flood's ownership of the marks at that time and did not raise its naked licensing claim until filing the current lawsuit a decade later.

Faced with the reality of these significant failures, Virginia Flood argues that the bankruptcy trustee should have commenced, *sua sponte*, an adversary proceeding to resolve the priority and ownership interests prior to selling 1984 Flood's trademarks. This argument is a non-starter. As Virginia Flood expressly conceded at oral argument, no party contested the validity of the bankruptcy estate's title to the disputed marks or its right to sell those marks. Rather than objecting to the sale or at least raising the possibility of problems with the bankruptcy estate's ownership of the marks, Virginia Flood instead offered to purchase the marks. Although Virginia Flood argues that its attempt to purchase the marks should have put the bankruptcy court on notice that Virginia Flood believed that it had an interest in the marks, exactly the opposite is true. By offering to purchase the

disputed marks, Virginia Flood implicitly recognized the bankruptcy estate's ownership of those marks.

Because we agree with the district court that 1996 Flood was the proper successor-in-interest to 1984 Flood, and that Virginia Flood is barred by the doctrine of licensee estoppel from challenging 1996 Flood's ownership of those marks, we affirm the district court's order granting 1996 Flood's motion for partial summary judgment and denying Virginia Flood's motion for summary judgment.

## III.

One issue remains that we cannot resolve. The district court's order granted 1996 Flood priority to the disputed marks and the "exclusive right to use and register the trade name and service mark JOHN C. FLOOD and any other name or mark similar to JOHN C. FLOOD that, by colorable imitation or otherwise, is likely to cause confusion or mistake." *John C. Flood of Virginia*, 700 F. Supp. 2d at 99. The district court further held "that no Virginia Flood party has the right to register or use beyond the terms of its license the name and mark JOHN C. FLOOD or its abbreviated version FLOOD." *Id.* A question remains, however, whether Virginia Flood is permitted to use the disputed marks with the distinguishing modifier "of Virginia." The answer to that question depends on the exact scope of Virginia Flood's license, a factual issue that was disputed before the district court but never resolved because the district court decided the case on summary judgment. Although we affirm the decision of the district court holding that 1996 Flood was the proper successor-in-interest to 1984 Flood, we must remand the case to the district court for determination of the ownership and priority rights of the parties as to the modified trademark "John C. Flood of Virginia." To clarify, our decision to

affirm the district court is limited to the unmodified marks and leaves open the possibility that with regard to the modified marks, Virginia Flood is not estopped and could establish abandonment or some other basis of priority or ownership.

## IV.

For the reasons set forth above, we affirm the decision of the district court.  We remand the case to the district court for further proceedings.

*So ordered.*